BLAKE-MOFFITT AND TOWNE, INC. (BORDER BROKERAGE CO.), ET AL. *v.* UNITED STATES

No. 8064.—Entered at Blaine, Wash.
Entry No. 2959-E, etc.

(Decided November 27, 1951)

*Lawrence, Tuttle & Harper (George R. Tuttle* of counsel) for the plaintiffs.
*Charles J. Wagner,* Acting Assistant Attorney General (*John J. Antus,* special attorney), for the defendant.

MOLLISON, Judge: The appeals listed in schedule "A," hereto attached and made a part hereof, are for reappraisement of the value of certain toilet tissue paper imported from Canada. Two brands or types of tissue are involved, one type, known as "Westminster" brand, having been invoiced and entered at $4.98 per case, United States currency, f. o. b. mill at New Westminster, British Columbia (which is near Vancouver, B. C.), and appraised at $6.11 per case, Canadian currency, net, packed, and the other type, known as "Purex" brand, having been invoiced and entered at $6.81 per case, United States currency, f. o. b. mill, and appraised at $8.33⅓ per case, Canadian currency, net, packed. The entries were made on June 30 and July 8, 1948, respectively.

On the part of the plaintiffs, it is contended that the invoiced and entered prices represent the export values of such merchandise, as "export value" is defined in section 402 (d) of the Tariff Act of 1930 (19 U. S. C. § 1402 (d)), and that no foreign value, as defined in section 402 (c) of the same act, as amended, existed.[1] It is alternatively

[1] SEC. 402. VALUE.

\*       \*       \*       \*       \*       \*       \*

(c) FOREIGN VALUE.—The foreign value of imported merchandise shall be the market value or the price at the time of exportation of such merchandise to the United States, at which such or similar merchandise is freely offered for sale for home consumption to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, including the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States.

(d) EXPORT VALUE.—The export value of imported merchandise shall be the market value or the price, at the time of exportation of such merchandise to the United States, at which such or similar merchandise is freely offered for sale to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States.

claimed that if at the time of exportation of the two types of merchandise here involved foreign values therefor be found to have existed, then such foreign values were the prices at which the manufacturer of the paper offered and sold such merchandise to its distributors in Canada, or, in the alternative, the prices at which a distributor of competitive brands offered and sold similar merchandise to all purchasers. It is further contended that the prices at which the distributors of the manufacturer of the paper here involved offered and sold such paper to all purchasers in the principal markets of Canada were not uniform, and consequently such prices do not represent foreign value within the meaning of the statute.

On the part of the defendant, it is contended that the prices at which the distributors of the manufacturer of the paper here involved offered and sold such paper represent the foreign value as defined in the act, as amended. These prices are represented by the appraised values.

In the circumstances of this case, first inquiry must be made as to the existence or nonexistence of foreign value, as defined in the statute, of paper such as that here involved at the manufacturer's level. In this connection, it is undisputed that the manufacturer of the paper involved, the Westminster Paper Co., Ltd., of New Westminster, B. C., offered its products for sale both for home consumption and for export only to persons or firms known as "distributors," in which category were wholesale paper dealers and wholesale grocers. According to the testimony given by Clifford T. Radcliffe, sales manager for the manufacturer, this method of doing business was the "ordinary course of dealing" on the part of all Canadian manufacturers of toilet paper in offering and selling their products for home consumption, and that while there were possible exceptions, the bulk of the business was done on that basis.

As to the practice of his own company, he said, merchandise such as that here involved was offered only to certain distributors because those firms constituting that group took the full production of the mill and there was therefore no need to solicit other business. It appeared that if a further supply became available because of either increased production or the dropping out of one of the group, other distributors might be added, but it clearly appears that even in such a situation his company did not offer to all who might care to buy but made offers only to distributors.

It is contended by the defendant that in these circumstances the merchandise was not "freely offered for sale * * * to all purchasers" within the meaning of those words as used in the statute, and, citing the case of *United States* v. *H. W. Robinson & Co. et al.*, 19 C. C. P. A. (Customs) 274, T. D. 45436, as directly in point, contends that the existence of foreign value at the manufacturers' level is thereby negatived for merchandise such as that at bar.

The *Robinson* case, *supra*, involved the value of certain silk tie squares used in the making of neckties. It appeared that the manufacturers of such tie squares in England, the country of exportation, sold only to wholesale merchants, who, in turn, sold to so-called "retail dealers" who manufactured them into ties. In holding that the proper foreign value was represented by the price at the wholesalers', rather than the manufacturers', level, the Court of Customs and Patent Appeals, speaking through the late Judge Bland, said:

We agree with the contentions of the Government that the sales price of the wholesalers to the tie manufacturers should be accepted as the foreign value. It may be, as is contended by the importer, that it is the "ordinary course of trade" between the manufacturer and the wholesaler to restrict the sales to wholesalers, but this is not the ordinary course of trade to which the statute refers. It must be remembered that the statute provides for "the ordinary course of trade" in which such or similar goods are "freely offered for sale to all purchasers" in the usual wholesale quantities. Since in the sales by the manufacturers the goods were not offered to all purchasers, the sales price should not be accepted as the proper foreign value. In the *Richard & Co.* case, *supra* [15 Ct. Cust. Appls. 143, T. D. 42216], this court had before it a question quite similar to the one at bar and said:

* * * Even if it be conceded that the *ordinary course of trade* may be determined by the usage in a minor fraction thereof, it certainly can not be said that merchandise is being *freely offered for sale* when it is offered to certain purchasers only, and these purchasers, ones who have "*satisfied*" the seller that they are wholesalers only. * * * (Italics quoted.)

*     *     *   ·   *     *     *     *

It is argued because sales to wholesalers are all made at the same price that therefore this price thus becomes the wholesale price. But it will be observed that the statute does not thus establish the wholesale price. Section 402 (b) does not provide that the wholesale price shall be the price to *wholesalers*, but the price in the usual *wholesale quantities*. The law is not concerned with the persons who buy, but the manner in which they buy (Italics quoted.)

So far as their basic or essential facts are concerned, there is no distinction between the situation which obtained in the case at bar and that which obtained in the *Robinson* case, *supra*. In both cases a manufacturer, in accordance with the custom and usage of the trade dealing in his products, offered the said products only to persons or firms who bought and sold at a certain level of such trade, to wit, at the distributor level, and did not offer his products for sale to any others. Judicial notice may be taken of the fact that this is and has been for decades a common practice in many lines of business, and that a very large, if not a major, portion of all marketing of manufactured products is done in that manner. It has, of course, the advantages to the manufacturer doing business in that manner that he (1) need not maintain as extensive a distributive setup as he would if doing business with all levels of trade, and (2) does not enter into competition at the lower levels of trade with his own purchasers at the higher levels.

The court, in the *Robinson* case, *supra*, concluded that the price at which the manufacturer sold to the wholesaler was not a price that

was "freely offered * * * to all purchasers," and in so concluding held, in effect, that the phrase in the foreign value statute "in the ordinary course of trade" was qualified by the term "freely offered for sale to all purchasers." To the writer of this opinion, it appears that the court did not hold that the term "freely offered for sale to all purchasers" was equally qualified, as it appears to be to the writer, by the phrase "in the ordinary course of trade," but, on the contrary, interpreted the term "freely offered for sale to all purchasers" as virtually absolute in its scope.

. It seems to the writer that the term "freely offered for sale to all purchasers" as used in the statute does not have an absolute meaning, but only a relative meaning, depending upon the ordinary course of trade in the merchandise involved with respect to offers for sale. Therefore, if, as appears here, it is the ordinary course of trade at the manufacturer's level to offer merchandise such as that involved only to distributors, then if, as also appears here, the price to all members of that class is uniform, that price is a price at which such merchandise is freely offered for sale to all purchasers who may purchase *in the ordinary course of trade.*

The holding of the *Robinson* case, *supra,* represents a stage in the development of the body of law with respect to the interpretation of the various elements of the valuation statute which has increasingly tended toward a result whereby the "price * * * at which such or similar merchandise is freely offered for sale to all purchasers" becomes the price at which the least favored purchaser may buy such or similar merchandise. The words "all purchasers" have been said to mean "all of those who cared to buy such goods in such markets." *United States* v. *American Glanzstoff Corp.,* 24 C. C. P. A. (Customs) 35, T. D. 48308. "All" in this sense appears to be synonymous with "anyone".

The courts, it seems to the writer, have interpolated into the valuation statute a requirement that an equality of opportunity to buy at the same price shall be accorded to all purchasers (i. e., anyone) who might care to buy before merchandise may be said to be freely offered for sale to all purchasers. Such a requirement is one which in actual business life is practically unobtainable or non-existent. The plain fact is that there is almost invariably no *one* price at which merchandise is offered to *all* who might care to buy, and the price at which merchandise is offered to *anyone* who cared to buy is usually the highest price.

Assume, for the sake of argument, that the manufacturer of the paper at bar offered the merchandise involved to all distributors at a uniform price, and that the distributors, in turn, offered the same merchandise to retailers or all others who cared to buy in wholesale quantities at a uniform higher price. Under the law as it has judicially

developed it would be said that the price paid by the latter was *the* price at which the merchandise was freely offered for sale to all purchasers within the meaning of the statute. But this is obviously not true, for *all* who cared to buy such merchandise in the usual wholesale quantities would include the distributors, and such merchandise was not offered to them at the higher price but at the lower, manufacturer's price. It would be an unrealistic tongue-in-cheek fiction to say that the distributors could, if they wished, pay the higher price if they choose. The truth is that the merchandise was neither offered to them at the higher price nor did they pay it in actual transactions.

Congress could not have failed to be cognizant of the fact of business life that there is ordinarily no one price at which all purchasers are freely offered merchandise. In the valuation statute, it is manifest that the purpose was to arrive at a standard whereby the value, for tariff purposes, of the imported merchandise might be determined by the value of such or similar merchandise in the foreign market. The various factors of value, such as the time, the place, and the circumstances of the offers of merchandise, as set forth in the statute, are for the purpose of determining a price for the imported merchandise which reflects its true value in the foreign market.

It appears from defendant's exhibit 3, being a report of a customs agent concerning an investigation of the foreign and export value of toilet tissue paper manufactured by the Westminster Paper Co., Ltd., the exporter herein, that the latter's export business was conducted upon the same basis as its home market business, i. e., offers for sale were made only to distributors. On page 3 of the exhibit the following appears:

The company makes considerable shipments to overseas destinations such as the Straits Settlements and Australia, and also some shipments to the West Coast of the United States. All such business is confined to accepted "distributors", and is done uniformly on the basis of British Columbia tax-free prices, less 5%, F. O. B. mill.

When, as is the case here, as clearly appears from the foregoing, merchandise has been imported under such circumstances that the standard of comparison of its value is the price at the manufacturer's level, it would be contrary to the spirit and intent, as well as the letter of the statute, to tie its valuation to the price at the distributor's level. Such a value would not be the true value of the merchandise, but a fictitious one, and if the trend of judicial interpretation of the valuation statute should seemingly require this result, then it is time that the interpretation of the statute should be reexamined and reconsidered.

There is no dispute between the parties here as to principal markets or as to usual wholesale quantities, it appearing that the price in any event was not based upon the quantity purchased.

· Upon the entire record, I find as facts:

(1) That the merchandise involved herein is toilet tissue paper, "Purex" and "Westminster" brands, manufactured by the Westminster Paper Co., Ltd., of New Westminster, B. C., imported during the period from June 30 to July 8, 1948.

(2) That at the time of exportation of the involved merchandise the said manufacturer offered its products for sale, both for home consumption and for export to the United States, only to its distributors, who took the entire output of the mill.

(3) That the manufacturer's mill at New Westminster, B. C., which is located near Vancouver, B. C., and Vancouver were principal markets in Canada for merchandise such as that here in issue.

(4) That the prices at the time of exportation of the involved merchandise at which the said manufacturer freely offered toilet tissue paper such as that here involved for home consumption to its distributors at its mill were $5.24 per case for "Westminster" and $7.17 per case for "Purex," Canadian funds, net, packed.

. (5) That the prices at the time of exportation of the involved merchandise at which the said manufacturer freely offered toilet tissue paper such as that here involved to its distributors for export to the United States were lower than the prices stated in finding (4).

I conclude as matters of law:

(1) That foreign value, as that value is defined in section 402 (c) of the Tariff Act of 1930, as amended, is the proper basis of value for the merchandise in question.

(2) That such values for the respective brands were as set forth in finding of fact (4) above.

Judgment will issue accordingly.